SILVERIO MATÍAS, Plaintiff and Appellee, v. SAM SCHWEITZER, doing business under the name of SCHWEITZER & Co., JUAN RAMOS VÉLEZ AND PORTO RICAN & AMERICAN INSURANCE Co., Defendants and Appellants.

No. 7802. Argued November 6, 1939.—Decided December 15, 1939.

*Brown, González & Newsom*, for the appellants. *García Méndez & García Méndez* for the appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the Court.

Silverio Matías suffered certain injuries when run over by an automobile on June 5, 1936, while walking along the highway from Rincón to Aguada. To recover the damages suffered he filed this suit in the District Court of Aguadilla against Sam Schweitzer, doing business under the name Schweitzer and Co., and Juan Ramos Vélez and the Porto Rican & American Insurance Company, the owner, chauffeur and insurer, respectively, of the automobile that caused the damage.

The district court weighed the evidence, which was contradictory, and deciding the conflict of the evidence in favor of the plaintiff, rendered judgment condemning the defendants to pay jointly and severally to the plaintiff the sum of $2,900 for personal damages, $500 for medical care and hospital stay, $50 for medicines, injections and special diet expenses, and $800 for attorney's fees—$4,250 in total—and costs, expenses and disbursements.

The defendants filed this appeal charging seven errors to the trial court, which we shall discuss jointly in the course of this opinion.

The appellants' main contention is that the trial court, moved by bias, prejudice and partiality, committed manifest error in the appraisal of the evidence.

The description of the accident made by plaintiff and his witnesses can be briefly stated as follows: the plaintiff took a car in Aguada to go to his house, to reach which, one must turn off the highway between Aguada and Rincón and take

a road which branches off from the left of said highway in the direction of Rincón. When near to said road, plaintiff advised the chauffeur of the car he was riding in to stop so he could alight. The vehicle stopped a few yards after the entrance to the road, which caused the plaintiff to walk back to it. According to the plaintiff and his witnesses, he walked along the left side of the highway in the direction of Aguada, carrying some packages, and while so walking, defendant's car, which moved in the same direction, that is, from Rincón towards Aguada, swerved from the right lane to the left side of the highway, where it struck the plaintiff, hooking him in the back with the pull on the rear left door, dragging him a few meters, swerving then to the right and finally stopping at a spot near the municipal road which plaintiff had to follow to get home. Plaintiff affirms that he did not see the car nor heard klaxon, horn or any other warning device. His witnesses affirm that the car moved at excessively high speed and gave no warning of its approach.

The defendant's version is that his automobile passed the one in which the plaintiff had come, which was going the opposite way, at a place where another car was parked on one side of the road, taking gas because it had run out of fuel. That there being no room for both cars to pass at the same time, on account of the space taken by the car that was parked, defendant's automobile slowed down, so that the one in which plaintiff had come could pass. That it went on, and in observing that plaintiff, who was walking along the left edge of the highway, apparently started to cross it, taking one or two steps towards the right lane where the defendant's car moved, the chauffeur slowed down and blew his horn, and plaintiff stopped at the time, but that immediately, and seeing that defendant slowed down, plaintiff suddenly ran across the highway and that albeit all the efforts of the chauffeur to prevent the accident, swerving all he could towards the edge to his right, the plaintiff, in the course of his race, ran into the car, striking the pull on the left rear

door, which was driven into his back causing the injury which gave origin to this suit. Two witnesses for the defense, who were pouring gasoline from bottles into the tank of the car aforesaid, affirm that they heard the noise made by defendant's car when the brakes were first applied and immediately afterwards saw defendant's car and heard the noise it made as it skidded to a stop at the time the plaintiff was struck on the right side of the road, in the direction of Rincón to Aguada, which was the proper lane for defendant's car. Some of defendant's witnesses affirm they saw the mark left on the right edge of the highway by the tires of defendant's car as it was braked to a stop.

Besides the eye witnesses who testified on behalf of the defendants, the day-book kept at the Police Station of Aguada was offered in evidence. The statements that Serrano, a policeman, maintains the plaintiff made to him on the day of the accident, are copied therein, and tend to show that said accident had happened as the defendants say it did. A sworn statement allegedly made by plaintiff before the Chief of Police of the District of Aguada, Carlos Guadalupe, on June 9, 1936, four days after the accident, wherein the plaintiff describes it just as the defendants do, was also presented in evidence.

Deciding the conflict of the evidence, the trial court said in its opinion as follows:

"The evidence in regard to the manner in which the accident occurred is contradictory and the court decides the conflict in favor of the plaintiff in not giving credit to the witnesses of the defendant.

"Besides, as appears from a somatic examination of the wound and from the expert testimony of Dr. Néstor D. Cardona, it presents a monstruous deformity similar in form and size to that of a ripe coconut.

"During the trial the judge, over the opposition of the plaintiff, admitted a copy of the report made in regard to the accident on June 7, 1936, by the Chief of the Insular Police, Guadalupe and also the police blotter on which the entry in regard to the accident was made by the Policeman Serrano on information. Both were admitted

to corroborate the testimony of the witnesses offered by the defendants. The court also admitted a declaration which is alleged to have been made and signed by the plaintiff of June 9, 1936, in the hospital of Aguada.

"In their testimony, the Chief of Aguada and the Policeman Serrano, sustained that on the day of the accident the plaintiff told them that the accident had occurred in the manner alleged by the defendants in their answer and that it was by virtue of that information and the investigation of two witnesses that a report was sent to the General Headquarters on the 7th and also entered in the police blotter of the Police Station of Aguada.

"There is no discrepancy whatever between the parties in regard to the fact that once the accident occurred, the plaintiff was taken in the automobile of the defendant Schweitzer to Aguada and that because no one was there to assist him he was immediately brought to Aguadilla where he was assisted in the clinic of Dr. Néstor Cardona by Dr. Cardona himself. It was after this that he was taken again to the Hospital of Aguada on the afternoon of the same day (the accident occurred between two and three o'clock in the afternoon), and after been interned in the Hospital of Aguada, the defendant chauffeur reported the accident to the Chief of Police of Aguada.

"According to Chief Guadalupe, he immediately took the Policeman Serrano, and he does not remember whether he found him in the police station or in the street but he does remember that they went together to the place of the accident, and it was then that Serrano found out about the accident. Serrano on the other hand, sustains that before he went to investigate the accident, he went to the hospital and he there found out from the plaintiff himself the manner and form in which it happened. On the other hand, Chief Guadalupe sustains that it was after the investigation at the place of the accident that he and Serrano went to the hospital to see the plaintiff Matías and talk with him.

"Dr. Cardona, who saw and assisted the wounded man in his clinic in Aguadilla and Dr. Luiggi, expert of the defendants, state that the plaintiff Matías had no mental lucidity due to a trauma and its consequences and he could not have made a statement as to the accident. And Dr. Cardona also stated that Matías was not in possession of his faculties for various days.

"The judge believes that Matías was not in a condition to make the statements attributed to him by Guadalupe and Serrano and further believes that he did not make those statements or any state-

ments relating to the manner in which the accident happened. His state of shock described by Dr. Cardona would not allow him to do so. Therefore, the report given by Chief Guadalupe on June 7 to the General Police Headquarters, inasmuch as it refers to the alleged statement of Matías is clearly untrue. On the other hand, the report on the police blotter made on the same day (5th) by Serrano in the presence of Guadalupe and under his orders, does not mention the alleged statements of Matías.

''The judge was surprised by the testimony of Chief Guadalupe, in regard to statements made by Matías on June 9th, or that is, four' days after the accident, when, according to the testimony of Dr. Cardona, wh·ch is given full credit by the judge, the plaintiff was not as yet in possession of his faculties and could not make a state· ment in regard to the accident with the details that appeared in the so called statement since once Matías was knocked down, he became unconscious and lost control of his mental faculties. This testimony was taken by Chief Guadalupe at eight or nine o'clock in the morning on June 9th in the Hospital of Aguada which is in the same city and the witness of the mark is the adjuster, Mr. Hernández, when Dr. Luiggi could have been used as a witness or the nurse who was in the hospital or any other person there present. The form of taking this supposed statement appears unsual and the entries and acts of Chief Guadalupe and most unsual of all is the extraordinary circumstance that although Guadalupe sustained that he did not re-quire the statement to be under oath before him, it appeared sworn to before him on June 9, 1936, and signed by Guadalupe in the place where the judge should have signed it as evidence of the taking of the oath and the title 'Judge' was substituted by that of 'District Chief of the Insular Police'. What interest did Guadalupe have? Why not wait for the arrival of the judge? This statement was de-livered by Guadalupe to the defendant company through Mr. Her-nández, the adjuster, who was present in court during all the trial, and it was admitted by this court.

Matías, on rebutal, denied ever having made the statements im-puted to h·m by Guadalupe and Serrano and denied that he had made the statements of June 9th. Hernández did not testify and said nothing in regard to this accident.

''For all these circumstances and unusual happenings and because the court believes that the accident occurred in the manner stated by the witnesses of the plaintiff, the testimonies of Guadalupe and Se-rrano are not given any credit whatsoever.''

If we consider that it was the purpose of the plaintiff to take the road leading to his house, to do which he had to cross the highway on or about the place he was struck; if we take into account that an automobile driven along one side of the road normally does not leave its course to take the other lane, and finally, if we consider that sometimes a pedestrian on suddenly finding himself in danger loses his head and instead of running away rushes to it, it is easy to conclude that the theory of the defendants is more probable than that of the plaintiff and his witnesses. However, this last theory is not materially impossible. Sometimes a distraction of the driver, a slope in the road and even a small obstacle run over by one of the front wheels at a moment in which the driver is not paying attention, may cause an automobile to swerve off its course if it is travelling at a great velocity, as the car of the defendants was travelling as is assured by the witnesses for the plaintiff. Therefore, as this version is not materially impossible, it being upheld by the evidence of the plaintiff, which was believed by the trial judge, who had the opportunity which we do not have of noticing the expressions and vacillations of the witnesses in answering questions put to them and also their conduct in general on the stand, we should not alter the findings of the lower court unless it appears from the evidence that in weighing it the court was influenced by bias, prejudice or partiality.

In the case of *Ayala* v. *Matías*, 54 P.R.R. 331, invoked by the appellants, wherein the theory of the defendant was similar to that sustained by the appellants in this case, this Court did not alter but on the contrary accepted the findings of fact of the lower court. We would have done the same thing in this case if the court *a quo* had believed appellants' evidence. Generally, in the cases in which we have not accepted findings of fact made by the lower court it has been because the evidence accepted by the court did not justify the conclusions or because appellee's evidence lacked a funda-

mental element for the existence of a cause of action. See the cases of *Navarro v. Cía. Azucarera "El Ejemplo"*, 53 P.R.R. ____; *Méndez v. Serracante*, 53 P.R.R. ____ and *Parés v. Echandi*, 55 P.R.R. 156.

The indignation shown by the judge of the lower court in considering the reproachful conduct of the Policeman Serrano and especially that of Chief Guadalupe, is in our opinion, perfectly justified by the acts of these two officers and this attitude can in no manner be considered as bias.

██ The defendants maintain that the lower court erred in not permitting the witness Dr. Luiggi to testify as to statements made to him by the plaintiff while interned in the Municipal Hospital of Aguada. The incident took place as follows:

"A. Well, yes; some question or other but as I was not interested in details . . .

"Attorney for plaintiff: That is inadmissible in evidence because to bring that evidence it is necessary to have previously asked Matías whether he had made any statements at a certain date to Dr. Luiggi, statements contrary to what he was testifying on the witness stand, and, in case he had made them, give Matías an opportunity to explain the contradictions that might exist between the two statements.

"Judge: What did he say, yes or no?

"The attorney for the defendant continues putting quest:ons to the witness:

"Q. During these days that Matías was in the hospital being attended by you, did he talk to you about the accident?

"A. Yes, sir, he told me something.

"Attorney for the plaintiff: I object to the admiss:on of that evidence because if the witness is to testify in regard to previous statements of Matías contrary to what he testified here in this case, he should have complied with the necessary requirements and when Mr. Matías was testifying he should have asked him if at such a date and place he made sa:d statements to Dr. Luiggi and tell him what the statements were.

"Attorney for the defendant: He was not asked anything in regard to Dr. Luiggi but as the witness in his testimony stated that anything that he may have said he must have said it when unconscious

or it was his spirit who talked—these are his exact words—and they mean that he did not say anything to anybody.

"JUDGE: The court believes the requirements have not been fulfilled to allow that impeachment and it will not admit the evidence offered by the defendants for that purpose.

"Attorney for the defense: We take exception to the ruling of the court for the reasons explained above." (T. of E. 398–400.)

The error committed by the lower court in holding that in order to present in evidence statements made by the adverse party it is necessary to lay the grounds required by the Law of Evidence in regard to the impeachment of a witness (Law of Evidence, Section 159), is evident. The statements of a party are admissions and as such should be received in evidence without the necessity of laying such grounds. See Jones on Evidence, Civil cases, 4th ed. (1938), page 454, Sec. 236.

But notwithstanding the error committed, it is not sufficient for the reversal of the judgment because the statements supposedly made by the plaintiff which the defendants intended to prove with the testimony of Dr. Luiggi, do not appear from the record. When the witness was asked if on a certain date the plaintiff talked to him as to what occurred, the witness answered: "Well, yes; some question or other but as I was not interested in details . . ." From this answer it is not possible to infer that what was told to him by the witness was adverse to the plaintiff. They might have been self serving declarations or might not have been material to the question. Under these circumstances, we cannot hold that in not permitting the witness to answer the question objected to, the appellant was prejudiced. The defendants should have insisted and told the lower court what they intended to prove with the witness. Only in this manner would we have been prepared to determine if the error was prejudicial or not. [4] In order that a judgment may be reversed based on the commission of an error, it is not

only necessary to prove the existence of the error but also the prejudice caused to the appellant.

■ Taking into consideration the nature and permanent character of the wound and the sufferings undergone by the plaintiff and the sufferings which he will undergo for the rest of his days, the damages of $2,900 which were awarded in the judgment, are not in our opinion excessive.

Let us see what Dr. Néstor Cardona who treated plaintiff says as to the nature of the wounds:

"They brought him with a serious wound on the right side. It was a deep cutting and lacerating wound. He had his bowels in the air, speaking colloquially; he had a rupture of the intestine and as the risk was serious at that moment because his condition was critical, we only cleaned the wound and put on a pad, a big piece of gauze with cotton and abdominal supporter; the chauffeur who brought him did not want to assume liability for the expenses; nobody would assume liability for the expenses; the man was dying and we sent him to die to the Municipal Hospital of Aguada because he was from there, from Aguada, with instructions that if he improved, I should be notified; I went to see him to Aguada two or three times and then eleven days later, on the sixteenth of June, we admitted him to my clinic due more to my professional interest in the case than to any pecuniary interest because the economic situation of the patient was poor and although they offered to pay me from the collection of the crop and to transfer the title of their farms to my name, I admitted him in my clinic due more to my professional interest than to whatever amount I could collect from him.

"⁎ ⁎ ⁎ ⁎ ⁎ ⁎ ⁎

"At first I refused to admit him in the clinic; nobody would take the responsibility and it was a serious risk since I thought that he would die in a few hours. (T. of E. 138–139.)

"He improved little by little and the only thing that we did was to tie together the two intestinal ends which were broken to his skin so that his feces would not contaminate his peritoneal cavity; in Aguada he improved little by little and then eleven days latter on June 16, we adm'tted him to the clinic.

"⁎ ⁎ ⁎ ⁎ ⁎ ⁎ ⁎

"He did not have the complete use of his faculties; he was a man of advanced age, about sixty years and everything that he ate came

out through his side and he was completely abandoned with all the feces there, he was not conscious. (T. of E. 140, 141.)

" * * * * * * *

"Well, after that he remained with a fecal fistula.

"Q. What is a fecal fistula?

"A. Well, it is a conduct that goes from the intestine to the exterior and eliminates the feces through there.

"Q. Does this condition continue?

"A. According to the clinical history of the case every two or three months it opens and then closes if he goes on a concentrated diet eliminating all liquids; if he takes very little liquid, the fistula closes and remains so while he is on the diet. (T. of E. 141–142.)

" * * * * * * *

"Q. Tell me Dr., you were attending the patient for 134 days?

"A. He was interned for 134 days and later I continued seeing him two or three times a week.

"Q. And he was eleven days in the hospital at Aguada before he came to your clinic?

"A. Yes, sir.

"Q. And in your clinic he was 134 days?

"A. Yes, sir.

"Q. And after that your continued visiting him?

"A. Yes, sir, he came two or three times a week for about six months.

"Q. Tell me Dr. is that wound very painful?

"A. It was a tearing wound, it tore the muscles.

"Q. How would you consider that wound in regard to whether or not it was painful, as not very painful or as very painful?

"A. Very painful.

"Q. Did he moan very much?

"A. Yes, sir.

"Q. What did you use to remove or mitigate the pains which he suffered?

"A. Morphine injections.

"Q. And later?

"A. Later I gave him sedatives through the mouth. (T. of E. 142–143.)

" * * * * * * *

"Q. On what part of the back was the wound and how was it produced, that is, what was the direction of the wound?

"A. It appeared that the hook cut him from the back towards the front and towards the muscles of the lumbar region.

"Q. With his back turned or sidewise? How must he has been?

"A. With his back turned.

"Q. So that the instrument which struck him caught him from behind?

"A. Yes, sir.

"Q. It hit him and then tore to the right.

"A. Yes, sir, from the back to the front. (T. of E. 143–144.)

" * * * * * * *

"Q. Do you think that with what he has he can work with a machete or a hoe?

"A. No, sir.

"Q. He should not work?

"A. No, sir." (T. of E. 146.)

In his opinion, referring to the wound, the judge of the lower court said:

"Besides, as appears from a somatic examination of the wound and from the expert testimony of Dr. Néstor de Cardona, it presented a monstruous deformity similar in form and size to that of a ripe coconut."

The evidence shows that the plaintiff earned $2.00 a day and was sixty years old on the day of the accident for though he testified at first that fifty-seven years ago he had married and that when he married he was twenty years old, immediately afterwards he testified that he was married after San Ciriaco although he states that he does not know how many years have passed since that cyclone. Since the San Ciriaco cyclone came on August 8, 1899, and the plaintiff was twenty years old on that date, there is no doubt that in 1936, the date of the accident, he must have been approximately fifty-seven years of age. Dr. Cardona testified also that the plaintiff was approximately sixty years of age on the date of the trial.

We do not consider the amount of $500 awarded in the judgment as medical fees excessive, since that sum not only included the surgical operation and medical care by Dr. Cardona for 134 days but also his stay during those 134 days in the clinic of said doctor in Aguadilla.

We should not disturb the discretion of the trial judge in awarding the item of $800 for attorney's fees, taking into consideration the nature of the suit and the work performed by the plaintiff's attorney.

For the foregoing reasons the judgment appealed from should be affirmed.